TEXAS & P. RY. CO. v. JONES et al.
(No. 8585.)

(Court of Civil Appeals of Texas. Ft. Worth. April 7, 1917. Rehearing Denied May 12, 1917.)

1. APPEAL AND ERROR ⬥⟳1027 — HARMLESS ERROR—REFUSAL TO REQUEST.

The refusal of a requested charge on the subject of accident in action for deceased's death at a railroad crossing was harmless, where under the evidence and other instructions the result would have been the same had the request been granted.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4033.]

2. RAILROADS ⬥⟳398(4)—INJURY TO PERSON ON TRACK — CONTRIBUTORY NEGLIGENCE — EVIDENCE.

Evidence that deceased had discovered the approaching train which killed him and ran along the track towards a cattle guard and crossing tended to show that deceased was guilty of contributory negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1360, 1361.]

3. RAILROADS ⬥⟳398(3)—INJURY TO PERSON ON TRACK—PRECAUTIONS—EVIDENCE.

Evidence held sufficient to show that locomotive engineer could have reasonably anticipated that deceased might fall into a cattle guard, and that engine might overtake him before he reached the street crossing, thus justifying refusal of an instruction that the engineer was under no duty to attempt to stop the train until deceased fell into the cattle guard.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1359.]

4. RAILROADS ⬥⟳397(9)—INJURY TO PERSON ON TRACK—ADMISSION OF EVIDENCE—OPERATION OF LOCOMOTIVE.

Where plaintiff had pleaded negligence of railway company's employés in operating train, expert evidence showing that under the circumstances it was improper to reverse the engine was admissible.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1353.]

5. RAILROADS ⬥⟳400(8)—INJURY TO PERSON ON TRACK—QUESTION FOR JURY—OPERATION OF LOCOMOTIVE.

The question of whether an engineer exercised due care in attempting to stop locomotive to avoid an impending accident was for the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1375.]

⬥⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**6. DEATH ☞99(4)—RAILWAY ACCIDENT—EXCESSIVE DAMAGES.**

A judgment of $20,000 for the death of a stock dealer aged 46 years with a life expectancy of 24.5 years, who was a generous provider, and who left surviving him a wife and five children, *held* not to be grossly excessive, and the fact that deceased had some indebtedness or that his two oldest daughters were nearing their maturity was immaterial, since a daughter's expectancy of pecuniary help from an indulgent father is not to be limited to the years of her minority, especially when unmarried, and in most cases her expectancy may extend up to, if not beyond, the hour of the father's death.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125, 126, 129.]

**7. JUDGMENT ☞199(1) — NOTWITHSTANDING VERDICT—SPECIAL VERDICT.**

Where a special verdict was rendered, the court could not render a judgment non obstante veredicto in view of Rev. St. art. 1990, making it the duty of the court to render judgment thereon unless such verdict be set aside and a new trial granted, and article 1994, providing that a judgment must conform to the pleading, the nature of the case proved, and the verdict; and the court had but two alternatives, either to set aside the verdict and grant a new trial, or to render judgment in accordance with the verdict.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 367, 374, 375.]

**8. RAILROADS ☞398(1)—SUFFICIENCY OF EVIDENCE TO SUPPORT VERDICT.**

In action for deceased's death on the track, evidence *held* sufficient to sustain a verdict for plaintiff.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1356, 1363.]

Appeal from District Court, Denton County; C. F. Spencer, Judge.

Suit by J. R. Jones, as executor of B. G. Bradford, and others, against the Texas & Pacific Railway Company. Judgment of $20,000 for plaintiffs, and defendant appeals. Affirmed.

Head, Dillard, Smith, Maxey & Head, of Sherman, and H. R. Wilson, of Denton, for appellant. Sullivan & Hill, of Denton, and Carden, Starling, Carden, Hemphill & Wallace, of Dallas, for appellees.

CONNER, C. J. This suit was instituted in the district court of Denton county by J. R. Jones, as the executor of B. G. Bradford, against the Texas & Pacific Railway Company, to recover damages on account of the death of said Bradford, who was run over and killed by one of defendant's trains in the city of Pilot Point. That portion of the track where deceased was killed runs north and south through the city of Pilot Point. It had long been used by pedestrians going to and from the business portion of the city. The deceased resided on the west side of the tracks, and had lived in Pilot Point many years. About 9:35 a. m. on the morning of November 6, 1914, he was walking north on defendant's track, when a regular passenger train of defendant, due at Pilot Point at 9:38 a. m., approached him from the south, and in

attempting to cross a cattle guard at a public street crossing he fell into it and was run over by said passenger train and instantly killed.

The grounds of negligence alleged were: That the train was run at an excessive rate of speed, that the employés operating the train failed to exercise ordinary care to keep a lookout for persons on the track, and that said employés discovered that deceased had fallen into the cattle guard and realized his danger and peril, and by the use of the means at hand could, by the exercise of due care, have slackened the speed of the train sufficiently to have given deceased time to extricate himself from the cattle guard and get off the track, or to have stopped the train before reaching that point, but that they failed to use said means to avoid injuring and killing deceased.

The defendant answered by the general denial, a specific denial of each material allegation in the plaintiff's petition; that the death of deceased was caused by his own negligence in continuing on the track with knowledge of the approach of the train in ample time to have left the track; that the employés operating the train saw deceased on the track and gave him warning of the approach of the train by sounding whistles and ringing the bell, and had reason to believe and did believe that he heard the warnings and could and would leave the track before the train reached him; that the deceased was not in any danger until he fell into the cattle guard, and that as soon as he fell they saw him, and realized his danger, and immediately used all the means they had to stop the train and avoid striking deceased, but could not do so; and that the deceased falling into the cattle guard was a thing that was not expected or reasonably anticipated by the employés, and his death was therefore directly and proximately caused by an accident.

The court withdrew from the jury all issues of fact as to liability except the issue of discovered peril, which he submitted in the form of special issues. The special issues with the answers of the jury thereto are as follows:

"(1) Did the engineer of the defendant railway company operating the engine which struck the deceased, B. G. Bradford, discover and realize the dangerous and perilous situation of the deceased before the engine struck him?"

To which the jury answered: "Yes."

"(2) If you have answered the first question in the affirmative, then you will answer the following question, to wit: After the engineer operating the engine discovered and realized the perilous and dangerous situation deceased, Bradford, was in, could he, by the use of all the means at hand, consistent with the safety of himself, the engine, and train, and persons thereon, have stopped or slackened the speed thereof and avoided killing him?"

To which the jury answered: "Yes."

"(3) If you have answered the first question in the affirmative, then you will answer the fol-

lowing question, to wit: After he discovered and realized the dangerous and perilous situation of the deceased, Bradford, did the engineer operating such engine fail to exercise ordinary care to use all the means at hand consistent with the safety of himself, the engine, and train, and the persons riding thereon, to stop the engine and to prevent injuring said Bradford?"

To which the jury answered: "Yes."

In addition to the special issues the court, at appellant's request, also gave the following instructions:

"No. 3. In connection with an explanation of questions Nos. 1, 2, and 3 in the court's main charge, you are instructed that, if the deceased, Bradford, knew that the train was approaching, and it reasonably appeared to the engineer that he had such knowledge and could leave the track and get out of the way of the train, then the engineer had the right to assume that he would leave the track in time to avoid being struck by the train, and further had the right to act on said assumption and continue to run the train until such time as he actually discovered and realized that deceased either would or could not leave the track and get out of the way of the train.

"No. 4. Before you would be authorized to answer question No. 3 of the main charge of the court in the affirmative, the burden rests upon the plaintiffs to show by a preponderance of the evidence, which means the greater weight and degree of credible testimony, that the engineer operating the engine on the occasion in question discovered and realized that deceased, Bradford, was in a dangerous and perilous position, and that after such discovery and realization of the peril and danger of the deceased the engineer failed to exercise ordinary care to use all means he had at hand, consistent with the safety of the train and the passengers thereon, to stop the engine and avoid striking and injuring deceased, and, unless this is done, you will answer said question 'No.' * * *

"No. 6. If you find and believe from the evidence that the whistle on the engine was sounded when the train was such a distance south of the deceased as that deceased would have had time and opportunity to have left the track before it reached him, and if you further believe from the evidence that, instead of leaving the track, he remained thereon and continued to travel north with a view of getting off the track at Main street crossing, and if you further believe from the evidence that it was not until he fell into the cattle guard at Main street crossing that the engineer discovered and realized that he was in a position of peril and danger, then the engineer was not under duty of making any effort to stop the train until deceased fell into the cattle guard."

Upon the verdict of the jury as returned the court entered up a judgment for the plaintiff in the sum of $20,000, apportioned as follows:

"To Mary S. Bradford, $5,000.00; to Herbert Bradford, $4,500.00; to Robert Bradford, $4,500.00; to Miss Florine Bradford, $1,500.00; to Miss Lillie Bradford, $2,000.00; to Miss Jewell Bradford, $2,500.00."

From that judgment the defendant has duly prosecuted an appeal.

[1] Appellant first assigns error to the action of the court in refusing the defendant's requested charge as follows:

"Was the death of the deceased, Bradford, the result of an accident?

"In connection with and in explanation of the above question you are instructed that by the word 'accident,' as used herein, is meant where a thing occurs unintentionally and without negligence of any one directly causing same."

The issue of accident was pleaded by the defendant and in the brief of the appellant the testimony is reviewed for the purpose of showing that the issue of accident was raised by the evidence. But if it be admitted that the issue of accident was raised, we yet think the error of the court, if any, in refusing the requested charge, is not one which, under our rules, will require a reversal. To constitute reversible error, it must be one such as in our opinion "amounted to such a denial of the rights of the appellant as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment in the case," etc. See rule 62a (149 S. W. x) for the government of the Courts of Civil Appeals; Flynn v. Radford Gro. Co., 174 S. W. 902; Braun v. Hickman, 176 S. W. 879. Considering the requested instruction from this viewpoint, it will be noted that, under the charge and explanation herewith given, there could properly have been no finding that the death of the deceased was the result of an "accident" without a determination that there was no negligence "of any one" directly causing the death.

[2] One of the witnesses, Bettie Drake, who placed herself in a favorable position to witness the circumstances involved, testified that:

"He [deceased] was looking forward until he got to the cattle guard, then he looked back over his shoulder, and kept walking and stepped into the cattle guard."

This with other testimony tending to show that the deceased had probably shortly before discovered the approaching train, and thereupon ran in the direction of the cattle guard in order evidently to attain the public street crossing just beyond, would tend to show that the deceased himself was guilty of negligence, under the circumstances. There was also evidence, as will be hereinafter more particularly shown, which undoubtedly tended to show that the operatives of the engine which ran over and killed the deceased were guilty of negligence after having discovered the deceased's perilous position. The issue of appellant's negligence after the discovery of the deceased's perilous position was fully and fairly, as it seems to us, submitted to the jury, particularly when considered in connection with the explanatory charges requested by appellant's counsel and given by the court. The issue of appellant's negligence thus presented was based upon and determined by the jury in the appellee's favor, as will be seen by a consideration of the special issues with the answers of the jury thereto, as hereinbefore set out. If these findings must be supported, as we will later have occasion to consider, then we are confronted with the judicially determined fact that there was at least negligence on the part of the operatives of appellant's engine, which proximately caused the death of the deceased. It is altogether improbable,

we think, that the jury would have thus found in favor of appellee under the charges submitted, and at the same time rendered a verdict favorable to appellant upon the same issue necessarily involved in the requested charge. The error therefore, if any, whatever else may be said in answer to the assignment, did not, in the language of the rule, amount "to such a denial of the rights of the appellant as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment." The assignment will accordingly be overruled.

[3] By another assignment appellant insists that the court should have given its requested special charge No. 7, which reads as follows:

"No duty rested upon the engineer to attempt to stop the train until deceased, Bradford, fell into the cattle guard."

The insistence is that it appears by the "undisputed evidence" that the deceased was not in a "perilous position" until he fell into the cattle guard.

The engineer, among other things, testified, in substance, that he was sitting in his proper position on the right side of the engine in the cab keeping a lookout, and could see down the track; that he first saw deceased when he was some 250 or 275 feet from the Main street crossing, where he was killed walking between the rails going north; that at this time he, the engineer, was some 1,000 to 1,500 feet south of the deceased running at the rate of about 12 or 15 miles an hour; that he then blew the crossing whistle; could not tell whether deceased noticed the sound of the whistle at that time or not; that when the train was about 900 feet south of deceased he blew the whistle again, regular crossing whistle; blew it for the crossing, but could not tell whether deceased noticed the blowing of the whistle at that time; that he next blew the station whistle when the train was about 600 feet from the deceased; that when he blew the station whistle the deceased had gotten within 150 feet of the Main street crossing; that just after the station whistle was given the deceased started to walk faster, which led the witness to believe that he had heard the whistle; that the train was then speeding between 12 or 15 miles an hour; that when the front of the engine got within about 200 feet of the crossing at Main street, where the deceased was killed, and deceased was within about 40 feet of the crossing, witness blew the stock whistle which is a rapid sharp toot of the whistle five or six times; that when the stock whistle was blown deceased then started to run in the same direction he was going up the track; that when the witness blew the station whistle when deceased was about 600 feet north of the engine he quickened his pace and began to walk faster, which made the impression on the witness' mind that he heard the whistle and he was looking for him to get off the track; that all he had to do was to step off; that when the stock whistle was blown and deceased did not get off the track, but started to run, witness was of the impression that the purpose of the deceased was to get off at the crossing; he ran up the track, and when he got to the cattle guard he fell in it; the engine was then about 100 feet from him when he fell into the cattle guard; that, when the deceased fell into the cattle guard, witness put the brakes immediately into emergency position, which gave all the power he had, and he then immediately opened the sand lever, and then reversed the engine; that he made his best efforts and did all he could to stop the train after deceased fell into the cattle guard, but could not stop it before it struck the deceased.

Other testimony perhaps might be cited of the same tendency, but it will be observed from the testimony of the engineer, the substance of which on this point we have stated, that the engineer must have been some 150 to 200 feet south of the deceased when the deceased heard the stock whistle and began to run up the track, presumably between the rails towards the cattle guard and crossing. The engineer says that his impression at the time was that the purpose of the deceased was to get off at the crossing. Other evidence was to the effect that the engineer had been engaged in operating trains over the track at the place in question for many years, and thus must have known of the precise location and condition of the cattle guard in question. A reasonable inference is that the engineer then knew that the deceased was not going to leave the track, even though he might have been able to so do. If so, the evidence, as it seems to us, undoubtedly was sufficient to raise the issue that the deceased from the very time he began to run up the track was in a perilous position, for the engineer and others testified that at the rate of speed the engine was traveling it would not be stopped under 300 or 400 feet. It cannot be said, we think, as a matter of law, that the engineer could not have reasonably anticipated that the deceased might fall into the cattle guard, or that the engine would overtake the deceased before he reached the road crossing. It is also perhaps worthy of notice that in the special instruction requested by appellant and given by the court no attempt was made to restrict the jury in determining the precise moment when the engineer first discovered the deceased to be in a perilous position. At all events, we think, under the evidence, the instructions given were preferable to the rejected charge under consideration.

[4, 5] Under appellant's proposition under its third assignment of error it is insisted that the court erred in permitting certain witnesses to testify to the effect that, under the circumstances and conditions at the time deceased was killed, in stopping the train they would not reverse the engine, because to do

so would decrease the retarding effect rather than to increase it, for the reason that no such issue of negligence was presented in the pleadings. We find no error in the court's ruling in this respect, however. The appellee pleaded in various forms that the operatives of the train failed to exercise ordinary care to avoid injuring the deceased, and the evidence objected to was relevant to this issue. The engineer in support of appellant's contention that due care was exercised was permitted to testify, among other things, that he did reverse the engine. Whether or not in so doing he exercised due care was a question for the jury, and it was entirely proper, as we consider, for appellee to show, if he could, that a reversal of the engine under the circumstances was not the careful or prudent thing to do. It is conceivable that a jury might find that it was not the proper thing to do under the circumstances, and yet further find from all of the evidence that the engineer on the whole did exercise ordinary care. In other words, the question relating to the reversal of the engine was not of itself an issue of liability, but one of the evidentiary circumstances not necessary to plead proper for consideration in determining the issue of liability which undoubtedly was alleged.

[6] It is further urged that the verdict and judgment against defendant is so "grossly excessive" as to show conclusively that the jury were influenced by passion or prejudice. There was evidence tending to show that the deceased at the time he was killed was 46 years of age, with a life expectancy, according to a standard mortality table, of 24.5 years; that he was a stock dealer whose profits ran "from $300 to $500 or $600 per month," which was equally divided with his partner; that he was kind, affectionate, and helpful to his wife and children; to the surviving widow, Mrs. Mary S. Bradford, the deceased had been married about 3 years, and of this union were born the minors, Herbert and Robert, 2 years and 11 months old, respectively, at their father's death; that the deceased was a generous provider, their yearly household expenses being something like $2,200; that his oldest daughter, Florine Bradford, about 20 years old when her father was killed, first finished her educational training in the high school at Pilot Point, and then went to Texas Christian University in Ft. Worth during the years 1912–13, after which Florine part of the time taught school and part of the time remained at home; that the father paid the expenses of Florine while attending her schools and while at home, supporting her and paying for her clothing. She testified that:

"When I needed any millinery or notions I usually would get them and have them charged. * * * When I needed any spending money I would get it from my father."

Lillie Bradford was about 18 years old when her father died. She was required by her father to attend school, and graduated at the Pilot Point High School the year of her father's death. Jewell Bradford was but about 16 years old at the time her father died. The evidence shows that the father took great interest in all of his children, advising and admonishing them "as to what things were proper and what things were improper." He did not drink, chew, or smoke, and on the whole we do not think it can be said that the verdict was excessive, especially to an extent which indicated passion or prejudice on the part of the jury. The mere fact that the deceased had some indebtedness or that the two oldest girls were nearing their maturity does not affect our conclusion. A daughter's expectancy of pecuniary help from a kind and indulgent father is not to be limited to the years of her minority, especially when unmarried. On the contrary, in most cases her expectancy may extend up to if not beyond the hour of his death. Ft. Worth & N. O. R. Co. v. Wallace, 74 Tex. 581, 12 S. W. 227; G., C. & S. F. Ry. Co. v. Dorsey, 66 Tex. 148, 18 S. W. 444; G., H. & S. A. Ry. Co. v. Gibson, 38 S. W. 480; T. & G. Ry. Co. v. Hall, 58 Tex. Civ. App. 598, 125 S. W. 71 (writ of error denied).

[7] Appellant's final assignment of error (the fifth) is that:

"The court erred in overruling defendant's motion to set aside the verdict, and, notwithstanding the verdict, enter judgment for defendant."

Under our practice in all cases the judgment of the court must conform to the pleading, the nature of the case proved, and the "verdict, if any," etc. Revised Statutes, art. 1994. And in cases where, as here, there is a "special verdict of the jury," it is made the duty of the court, "unless the same be set aside and a new trial granted, to render judgment thereon." Revised Statutes, art. 1990. Under this latter article particularly the court cannot properly render a judgment non obstante veredicto, as sought in appellant's motion, which the court overruled. The court had but two alternatives: First, to set the verdict aside and grant a new trial; or, second, to render judgment upon and in accordance with the verdict. It could not decline to pursue either course and render judgment contrary to the verdict. Scott v. Bauk, 66 S. W. 485, and authorities therein cited.

[8] In the case before us it is not even contended that the verdict as returned does not authorize the judgment. The verdict undoubtedly does so. It cannot therefore be said, we think, that:

"The court erred in overruling defendant's motion to set aside the verdict, and, notwithstanding the verdict, enter judgment for defendant."

But giving, as we should perhaps do in view of the size of the verdict, the assignment the most favorable construction, and interpreting it as appellant has done in its proposition thereunder, as one attacking the

verdict as contrary to the overwhelming preponderance of the testimony and unsupported by the evidence, we nevertheless think that both the assignment and proposition should be overruled. The evidence has partially been stated. All of it, however, has been carefully considered. In addition to what we have stated, at least two witnesses whose qualification as experts seems ample testified to the effect that, with the air and equipment shown by the evidence to be under the control of the engineer, the locomotive could have been stopped within less than 100 feet after the peril of the deceased was undoubtedly discovered. Henry Orr testified, among other things, that:

"When the engine was 150 or 200 feet away from deceased, the engineer blew a warning whistle at him, that is, three or four short blasts of the whistle. That when the engineer blew the warning whistle deceased commenced running north down the track between the rails and stepped in the cattle guard."

The engineer himself, as we have seen, places his engine "about 100 feet" from the deceased when he fell in the cattle guard. J. V. Paul testified to a wide experience as a locomotive engineer and as connected with electrical and locomotive engine operations, and gave it as his opinion that under the conditions existing at the time of the accident the train could be stopped in "from 65 to 80 feet." The witness J. W. O'Brien testified that he had an experience of about 12 years as a locomotive engineer, and that in his opinion the train under the conditions existing "could be stopped in from 80 to 85 feet." So that, considering the evidence as a whole, we entertain no doubt of its sufficiency to sustain the verdict of the jury on every issue submitted to it.

All assignments of error are accordingly overruled, and the judgment affirmed.